**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| SECURITIES AND EXCHANGE ) | |
| COMMISSION, ) | |
| ) | |
|         Plaintiff, ) | |
| ) | |
| v. ) | Civil Action |
| ) | No. 25-cv-10599-PBS |
| STEFANO R. CARCHEDI, MARIE L. ) | |
| FOEGH RAMWELL, and JAMES G. ) | |
| CULLEM, ) | |
| ) | |
|         Defendants. ) | |
| _____ ) | |

**MEMORANDUM AND ORDER**

March 24, 2026

Saris, J.

**INTRODUCTION**

The Securities and Exchange Commission (the "SEC") alleges

that Stefano R. Carchedi, Marie L. Foegh Ramwell, and James G.

Cullem ("Defendants") committed securities fraud in their efforts

to bring a new drug to market despite negative feedback from the

Food and Drug Administration (the "FDA"). Now before the Court are

Defendants' motions to dismiss the SEC's complaint. After hearing,

the Court concludes that the SEC has plausibly alleged misstatement

liability by Carchedi and scheme liability by Carchedi and Cullem

but has failed to plausibly allege scheme liability by Foegh.

Accordingly, Carchedi's motion to dismiss (Dkt. 52) is **DENIED**,

1

Cullem's motion to dismiss (Dkt. 47) is **DENIED**, and Foegh's motion to dismiss (Dkt. 49) is **ALLOWED**.

## BACKGROUND

In adjudicating a motion to dismiss for failure to state a claim, the Court "accept[s] as true all well-pleaded facts alleged in the complaint and draw[s] all reasonable inferences therefrom in the [plaintiff]'s favor." Back Beach Neighbors Comm. v. Town of Rockport, 63 F.4th 126, 128 (1st Cir. 2023) (third alteration in original) (quoting Legal Sea Foods, LLC v. Strathmore Ins. Co., 36 F.4th 29, 34 (1st Cir. 2022)).

In 2013, a pharmaceutical company referred to by the parties as "Company A" ceased development of dovitinib, a drug candidate for the treatment of renal cell carcinoma, because a Phase III trial failed to show that the drug was superior to a comparator drug. In 2018, predecessor companies of Allarity Therapeutics, Inc. ("Allarity") licensed dovitinib from Company A.[1]

In December 2019, Allarity requested a meeting with the FDA to discuss the potential filing of a New Drug Application (an "NDA") for dovitinib. The FDA wrote to Allarity in advance of the meeting, raising two concerns about the prospective application. First, the FDA took issue with Allarity's conducting a

---

[1] For ease of reference, the Court refers to Allarity and its predecessor companies collectively as "Allarity" except where specified otherwise.

retrospective non-inferiority analysis after the 2013 trial had already concluded.[2] Second, the FDA expressed concern about Allarity's plan to measure dovitinib's efficacy in terms of progression-free survival ("PFS") rather than overall survival ("OS").[3] The FDA wrote that Allarity's proposed clinical data and statistical approach were inadequate to support the submission of the NDA. Defendants, each of whom served as an executive at Allarity,[4] received a copy of the FDA's written response in February 2020.

A week after receiving the response, Carchedi, Foegh, and other Allarity staff met with the FDA. At the meeting, the FDA reiterated its objections regarding the non-inferiority margin and the reliance on PFS rather than OS. The FDA recommended that Allarity conduct a new trial. Each of Defendants received a copy

---

[2] A "non-inferiority" trial seeks to demonstrate that the efficacy of the test drug is within a clinically acceptable margin of the efficacy of a comparison drug. FDA guidance provides that the non-inferiority margin must be specified before the trial begins to avoid potential bias.

[3] PFS refers to the length of time from start of treatment to the earlier of tumor growth or patient death, while OS refers to the length of time from the start of treatment to patient death. FDA guidance provides that OS is preferable because it is more objective.

[4] Carchedi was the chief executive officer and president from 2019 to 2022; Foegh was the chief medical officer from 2017 to 2024; and Cullem held various executive positions (senior vice president of corporate development, chief business officer, and chief executive officer) from 2019 to 2023.

of the meeting minutes, which Foegh described as "pretty negative in terms of filing" with "[n]early every answer to our questions [beginning] with Do not file the NDA." Dkt. 1 ¶ 34 (alterations in original). Notes from Allarity consultants, which Foegh and Cullem received, likewise reflected that the FDA was unlikely to accept the dovitinib NDA.

After the meeting, Defendants drafted a press release which claimed that the "FDA indicated that they would accept the [NDA] filing if submitted," that Allarity "expects that [d]ovitinib will be approved by the FDA as a safe and efficacious drug," and that the FDA "provided input on the 'non-inferiority' margin" and "discussed [PFS] as an endpoint." Id. ¶¶ 38-40. The press release did not indicate that the FDA had in fact expressed serious concerns about the NDA and discouraged Allarity from filing it. The press release was approved by Carchedi, was issued in March 2020, and remained on Allarity's website through at least 2022.

On March 30, 2020, Carchedi presented at a meeting of Allarity's Board of Directors, at which Cullem was also in attendance. He characterized the FDA meeting as "positive" but did not disclose the FDA's negative feedback. Id. ¶ 43. Defendants regularly presented at Board meetings thereafter but did not alert the Board to the FDA's concerns.

In February 2021, Company A requested the minutes from the FDA meeting. Carchedi and Cullem decided to redact all "negative

information" from the minutes before sending them to Company A. Id. ¶ 45. When Cullem circulated the proposed redactions internally, he explained, "I have redacted (blackout text) any of the FDA comments about unwillingness to accept non-inferiority etc." Id. Cullem then sent Company A the redacted minutes in March 2021, copying Foegh.

Throughout 2021, Defendants prepared several other statements about Allarity's interactions with the FDA. First, Defendants helped create a slide deck used by Carchedi in discussions with prospective investors. The slide deck, which was posted online and filed with the SEC as part of Allarity's Form 8-K, claimed that dovitinib's efficacy had been demonstrated in a Phase III trial and stated that the dovitinib NDA had selected renal cell carcinoma as the lead indication "for fastest path to approval." Id. ¶ 53 (emphasis omitted). Allarity provided copies of the slide deck to several prospective investors in March and October 2021.

Second, Carchedi drafted and signed two "interim reports" which were published on Allarity's website in August and November 2021. The interim reports stated that the FDA had "provided guidance to [Allarity] regarding [dovitinib's] potential path to approval" and that "[b]ased on this feedback from the FDA, Allarity plans to provide a[n] [NDA] . . . during 2021." Id. ¶ 47 (emphasis omitted) (third alteration in original). The interim reports also

stated that dovitinib showed "identical clinical activity" to the comparator drug in the 2013 trial. Id. ¶ 48.

Third, Allarity filed two prospectuses with the SEC in November and December 2021. The prospectuses claimed that dovitinib was non-inferior to the 2013 comparison drug with respect to PFS and OS, even though the FDA disagreed with that efficacy claim. One of the prospectuses also stated: "we anticipate . . . approval of our [NDA]." Id. ¶ 51 (alterations in original). Carchedi signed both prospectuses.

On December 21, 2021, Allarity submitted an NDA for dovitinib. Contrary to the FDA's recommendations, the NDA did not contain data from any new trial and instead was based on a retrospective non-inferiority analysis of the 2013 trial data. That same day, Allarity announced that it had secured $20 million in funding from a single investor and that its stock had begun trading on NASDAQ. Allarity's Board awarded Defendants six-figure bonuses and stock option awards to reward them for meeting certain goals, including submitting the dovitinib NDA and listing Allarity's stock on NASDAQ.

In January 2022, the FDA advised Allarity to withdraw the NDA. Allarity declined to do so. In February 2022, the FDA announced its refusal to file the NDA based on its concerns about the retrospective non-inferiority analysis and the focus on PFS rather than OS -- i.e., the same issues that FDA had previously

communicated to Allarity. Upon learning of the FDA's refusal to file the NDA, the Chairman of Allarity's Board emailed Cullem, stating: "I'm interested to know who advised us to file against the crystal clear advice of the FDA." Id. ¶ 60. Cullem and Carchedi explained that filing the NDA had been crucial to procuring the $20 million investment in December 2021, which had helped Allarity avoid bankruptcy.

Later in February 2022, Allarity informed the public about the FDA's refusal to file the NDA, causing Allarity's stock price to plummet. In August 2022, Allarity announced that it was no longer pursuing development of dovitinib as a standalone drug.

## LEGAL STANDARD

To survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (cleaned up). This standard requires a court to "separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Kando v. R.I. State Bd. of Elections, 880 F.3d 53, 58

(1st Cir. 2018) (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). The court must then determine whether the factual allegations permit it "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Germanowski v. Harris, 854 F.3d 68, 72 (1st Cir. 2017) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

Because the SEC alleges that Defendants engaged in fraud, the SEC must also "state with particularity the circumstances constituting [the] fraud." SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) (en banc) (alteration in original) (quoting Fed. R. Civ. P. 9(b)). "To satisfy this particularity requirement, the [SEC] must set out the 'time, place, and content of the alleged misrepresentation[s] with specificity." Id. (quoting Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999)).

## **DISCUSSION**

The SEC alleges liability under two theories. First, the SEC claims that Carchedi is liable under SEC Rule 10b-5(b), see 17 C.F.R. § 240.10b-5(b),[5] and § 17(a)(2) of the Securities Act of 1933, see 15 U.S.C. § 77q(a)(2), for making misleading statements. Second, the SEC claims that all three Defendants are subject to

---

[5] Rule 10b-5 implements § 10(b) of the Securities Exchange Act of 1934, which prohibits "us[ing] or employ[ing], in connection with the purchase or sale of any security . . .[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

scheme liability under Rule 10b-5(a) and (c), see 17 C.F.R. § 240.10b-5(a), (c), and § 17(a)(1) and (3) of the Securities Act of 1933, see 15 U.S.C. § 77q(a)(1), (3), based on their allegedly fraudulent conduct. The Court examines each of these two theories of liability in turn.

## I.   <u>Misstatement Liability</u>

The Court first gauges the sufficiency of the SEC's claim that Carchedi violated Rule 10b-5(b) and § 17(a)(2). Rule 10b-5(b) makes it unlawful, "in connection with the purchase or sale of any security," to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Similarly, § 17(a)(2) prohibits, "in the offer or sale or any securities," "obtain[ing] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77q(a)(2).

The parties agree that these provisions impose identical pleading requirements on the SEC with respect to the presently disputed issues, with one exception: While Rule 10b-5(b) requires allegations of scienter, § 17(a)(2) requires only allegations of negligence. See <u>SEC v. Ficken</u>, 546 F.3d 45, 47 (1st Cir. 2008).

The Court concludes that, contrary to Defendants' arguments, the SEC has alleged each of the required elements with particularity.

Carchedi first argues that the SEC has not alleged fraud "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Relatedly, Cullem and Foegh point out that prior to December 2021, Allarity was not trading on any domestic stock exchange and its Danish predecessors were trading only on a Swedish exchange. They argue that all allegations regarding statements made before December 2021 thus run afoul of the Supreme Court's holding that Rule 10b-5(b) applies only to "transactions in securities listed on domestic exchanges[] and domestic transactions in other securities." Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 267 (2010).

Not so. The framework from Morrison does not apply here. See SEC v. Morrone, 997 F.3d 52, 60 n.7 (1st Cir. 2021) ("Morrison's transactional test only governs conduct occurring before July 22, 2010."). Even if it did, the SEC's complaint would satisfy that test. The SEC alleges that Allarity's stock began trading on NASDAQ (a domestic exchange) on December 21, 2021, and that Allarity procured a $20 million investment that same day. The SEC further alleges that Allarity was a Delaware corporation at the time of various of Defendants' alleged misstatements leading up to December 2021. These allegations adequately plead that Defendants' misstatements were made in connection with a security listed on

10

NASDAQ and/or that the investor incurred "irrevocable liability" in the United States. Id. at 60; see id. ("The existence of a domestic transaction suffices to apply the federal securities laws under Morrison. No further inquiry is required.").

Next, Carchedi contends that the SEC has not particularly alleged any "false, or misleadingly omitted, statement[s] of fact." U.S. SEC v. Lemelson, 57 F.4th 17, 24 (1st Cir. 2023) (quoting Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc., 22 F.4th 1, 7 (1st Cir. 2021)). He chiefly argues that the SEC premises its claims on "pure omissions." Macquarie Infrastructure Corp. v. Moab Partners, L. P., 601 U.S. 257, 264 (2024).

Again, the Court disagrees. Far from alleging merely "pure omissions," the SEC in fact alleges that Carchedi affirmatively made various misleading statements and "half-truths" actionable under Rule 10b-5 and § 17(a)(2). Id. For example, Carchedi used a slide deck to tell investors that dovitinib was on the "fastest path to approval," Dkt. 1 ¶ 53 (emphasis omitted); signed two interim reports stating that Allarity planned to submit an NDA for dovitinib "[b]ased on th[e] feedback from the FDA," id. ¶ 47 (emphasis omitted) (first alteration in original); and signed a prospectus stating that Allarity "anticipate[d] . . . approval of" the NDA, id. ¶ 51 (second alteration in original). By making these statements and not also disclosing that the FDA had in fact advised

11

strongly against filing the NDA, Carchedi, at minimum, plausibly "omitt[ed] a material fact necessary 'to make the statements made . . . not misleading.'" Macquarie, 601 U.S. at 263 (second alteration in original) (quoting 17 C.F.R. § 240.10b-5(b)).[6]

Carchedi further argues that the misstatements identified by the SEC were not plausibly "material." 15 U.S.C. § 77q(a)(2); 17 C.F.R. § 240.10b-5(b). He posits that no reasonable investor would find the statements material in light of the prospectuses, which he argues contained extensive risk disclosures that acknowledged (among other things) that Allarity "may not receive regulatory approval" from the FDA. Dkt. 53 at 23 (emphasis omitted).

The Court rejects this argument, which is better suited for later stages of the litigation. See, e.g., Lemelson, 57 F.4th at 25 ("The determination of materiality is typically left to the jury."). At the pleading stage, the SEC has plausibly alleged that a reasonable investor could view Carchedi's misleading statements as "having significantly altered the 'total mix' of information made available," id. (quoting Basic Inc. v. Levinson, 485 U.S. 224, 232 (1988)), particularly given that the prospectuses nowhere

---

[6] The Court likewise rejects Carchedi's arguments that the SEC's allegations merely target "expression[s] of corporate optimism," Dkt. 53 at 16 (quoting Shaw v. Digit. Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996)), and that the SEC did not allege Carchedi's involvement with the alleged misstatements and omissions with particularity. On the contrary, the SEC has identified specific misleading statements and has provided the dates on which those statements were made and signed by Carchedi.

disclosed the specific criticisms received from the FDA regarding dovitinib. Indeed, the SEC alleges that Carchedi himself told the Chairman of Allarity's Board that filing the NDA was critical in procuring the $20 million investment in December 2021. It follows that statements of optimism regarding the FDA's likelihood of accepting the NDA, while omitting the FDA's true feedback, would likewise have been material.

Finally, Carchedi asserts that the SEC has failed to plead that he made the alleged misstatements with scienter. He argues that the SEC's allegations fail to plausibly show "either conscious intent to defraud or 'a high degree of recklessness,'" as is required to plead a Rule 10b-5(b) violation, Lemelson, 57 F.4th at 28 (quoting Ficken, 546 F.3d at 47), or negligence, as is required under § 17(a)(2), see Ficken, 546 F.3d at 47.

Contrary to Carchedi's argument, the SEC has alleged ample and particular facts supporting a plausible inference of scienter. The SEC alleges that Carchedi knew of the FDA's specific concerns regarding the dovitinib NDA yet chose to conceal those criticisms while making misleading statements, including those in the investor slide decks, interim reports, and prospectuses. Carchedi allegedly even went so far as to redact the criticisms from the FDA meeting minutes before sending them to Company A. Carchedi's decision to make statements when he "knew facts suggesting [that] the statements were inaccurate or misleadingly incomplete is

13

classic evidence of scienter." SEC v. Johnston, 986 F.3d 63, 74 (1st Cir. 2021) (quoting Aldridge v. A.T. Cross Corp., 284 F.3d 72, 83 (1st Cir. 2002)). The SEC further alleges that Carchedi benefitted from these actions by securing a bonus and helping Allarity avoid bankruptcy. See Kader v. Sarepta Therapeutics, Inc., 887 F.3d 48, 60 (1st Cir. 2018) (explaining that "allegations that 'the very survival of the company w[as] on the line'" may support an inference of scienter (alteration in original) (quoting Corban v. Sarepta Therapeutics, Inc., 868 F.3d 31, 41 (1st Cir. 2017))). These allegations are adequate to support a plausible inference of scienter under Rule 10b-5(b) and, a fortiori, of negligence under § 17(a)(2).

The Court thus concludes that the SEC has plausibly alleged that Carchedi is subject to misstatement liability under Rule 10b-5(b) and § 17(a)(2).

## II. Scheme Liability

The Court next addresses the SEC's claims that all three Defendants are subject to "scheme liability" under Rule 10b-5(a) and (c) and § 17(a)(1) and (3). The scheme liability provisions of Rule 10b-5 make it unlawful, "in connection with the purchase or sale of any security," to "employ any device, scheme, or artifice to defraud," 17 C.F.R. § 240.10b-5(a), or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," id. § 240.10b-5(c). Similarly,

14

§ 17(a)'s scheme liability provisions make it unlawful, "in the offer or sale of any securities," to "employ any device, scheme, or artifice to defraud," 15 U.S.C. § 77q(a)(1), or to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser," id. § 77q(a)(3). For present purposes, the parties agree that Rule 10b-5(a) parallels § 17(a)(1) and Rule 10b-5(c) mirrors § 17(a)(3), and that the parallel provisions are coterminous, except that § 17(a)(3) merely requires negligence while the other three provisions require scienter. See Johnston, 986 F.3d at 74.

The Court's analysis of the SEC's scheme liability claims must begin with a review of two Supreme Court decisions. First, in Janus Capital Group, Inc. v. First Derivative Traders, the Supreme Court held that the "maker of a statement" for purposes of misstatement liability under Rule 10b-5(b) "is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." 564 U.S. 135, 142 (2011). Finding that "[o]ne who prepares . . . a statement on behalf of another is not its maker," id., the Court held that a person who merely "participat[es] in the drafting of a false statement" that is ultimately "made" by another person cannot be held liable under Rule 10b-5(b), id. at 145, 148.

Several years later, in Lorenzo v. SEC, the Supreme Court determined that "those who do not 'make' statements (as Janus

15

defined 'make'), but who disseminate false or misleading statements to potential investors with the intent to defraud," can be subject to scheme liability under Rule 10b-5(a) and (c) and § 17(a)(1). 587 U.S. 71, 74 (2019).[7] The scheme liability provisions, the Court noted, are textually "exp ansive" and thus "capture a wide range of conduct." Id. at 79. The Court rejected the petitioner's argument that scheme liability can be incurred "only when conduct other than misstatements is involved," id., instead holding that the misstatement liability and scheme liability provisions have "considerable overlap," id. at 80; see also id. (citing early administrative decisions in which the SEC found both misstatement and scheme liability "based on the same misrepresentations and omissions"). Further, the Court rejected the petitioner's argument that this holding was at odds with Janus, stating that Janus "remain[s] relevant (and preclude[s] liability) where an individual neither makes nor disseminates false information -- provided, of course, that the individual is not involved in some other form of fraud." Id. at 82.

---

[7] In Lorenzo, the Supreme Court analyzed Rule 10b-5(a) and (c) and § 17(a)(1), but not § 17(a)(3), which was not before it. See 587 U.S. at 77. But because the language of § 17(a)(3) essentially mirrors that of Rule 10b-5(c), this Court finds Lorenzo's holding applicable to § 17(a)(3) as well. See, e.g., Malouf v. SEC, 933 F.3d 1248, 1260 (10th Cir. 2019) ("Lorenzo . . . controls on § 17(a)(3) as well as the other provisions."); SEC v. Sharp, 626 F. Supp. 3d 345, 394 (D. Mass. 2022) ("[W]here the pleading requirements for [§§] 17(a)(1) and 10(b) are met, they are also met for [§] 17(a)(3)."). The parties do not argue otherwise.

The SEC contends that Defendants have violated the scheme liability provisions of Rule 10b-5 and § 17(a) under the Lorenzo framework. The SEC alleges, among other things, that Defendants each participated in drafting a misleading press release and investor slide deck; that Defendants concealed the FDA's negative feedback from Allarity's Board of Directors despite regularly presenting to the Board; that Cullem failed to correct Carchedi's false representation to the Board that the FDA's feedback was "positive," Dkt. 1 ¶ 43; and that Carchedi and Cullem emailed redacted minutes of the FDA meeting to Company A, copying Foegh, to conceal the FDA's criticisms. In the SEC's view, these alleged actions constitute "an 'artful strategem' or a 'plan[]' 'devised' to defraud an investor" under Rule 10b-5(a) and § 17(a)(1) and likewise represent "'a[n] act, practice, or course of business' that 'operate[d] . . . as a fraud or deceit'" under Rule 10b-5(c) and § 17(a)(3). Lorenzo, 587 U.S. at 78-79 (second and fourth alterations in original) (quoting 17 C.F.R. § 240.10b-5(c)).

Defendants resist this conclusion, arguing that the SEC's scheme liability claims must be dismissed because the SEC fails to plausibly allege a fraudulent scheme distinct from Carchedi's misstatements. In support of this proposition, they primarily cite the Second Circuit's decision in SEC v. Rio Tinto plc, 41 F.4th 47 (2d Cir. 2022), and district court cases following that decision. In Rio Tinto, the Second Circuit determined that Lorenzo did not

17

abrogate prior circuit precedent holding that "misstatements and omissions can form part of a scheme liability claim, but an actionable scheme liability claim also requires something beyond misstatements and omissions, such as dissemination." 41 F.4th at 49. The Second Circuit reasoned that allowing individuals to be "primarily liable under the scheme subsections for participation in the making of . . . misstatements" would undermine Janus, which precludes primary liability under Rule 10b-5(b) for those same actions. Id. at 52.

As several courts have recognized, Lorenzo permits "considerable overlap" between misstatement liability claims and scheme liability claims. 587 U.S. at 80; see, e.g., In re Alphabet, Inc. Sec. Litig., 1 F.4th 687, 709 (9th Cir. 2021); Malouf v. SEC, 933 F.3d 1248, 1259-60 (10th Cir. 2019). Nevertheless, the Court agrees with the Second Circuit that "misstatements and omissions alone are not enough for scheme liability." Rio Tinto, 41 F.4th at 54 (emphasis added). Rather, "something extra" -- of which "dissemination is one example," per Lorenzo -- is required. Id. Holding otherwise would render the misstatement liability provisions of Rule 10b-5 and § 17(a) obsolete. Moreover, scheme liability cannot be premised solely on drafting a misstatement, see id., because finding otherwise would permit the SEC to circumvent Janus entirely, see Lorenzo, 587 U.S. at 82 (noting that Janus can still "preclude liability" in some circumstances).

18

Here, the SEC alleges two "extra" fraudulent practices beyond Defendants' preparation of misleading statements to investors. Rio Tinto PLC, 41 F.4th at 54. Those practices were related to Allarity's Board of Directors and to Company A (the licensor of dovitinib), respectively.

First, with respect to Allarity's Board, the SEC alleges that Carchedi told the Board that the FDA meeting was "positive" while not disclosing the FDA's criticisms. Dkt. 1 ¶ 43. Cullem was present at the Board meeting and did not correct Carchedi. The alleged deception of the Board eventually resulted in the Chairman of the Board's surprise that Allarity had been "advised . . . to file [the dovitinib NDA] against the crystal clear advice of the FDA." Id. ¶ 60. The SEC thus plausibly alleges that Carchedi deceived the Board into allowing the filing of the NDA and thereby attracting investment.

Second, with respect to Company A, the SEC alleges that Carchedi and Cullem redacted all "negative information," including details regarding the FDA's "unwillingness to accept [a] non-inferiority" analysis in the NDA, from the FDA meeting minutes to be sent to Company A. Id. ¶ 45. Cullem then emailed the redacted minutes to Company A. This conduct plausibly constitutes a fraudulent scheme and act geared toward retaining the license for dovitinib, filing the NDA, and attracting investment. Cf. SEC v. Wilcox, 663 F. Supp. 3d 146, 160 (D. Mass. 2023) (holding that

19

"provid[ing] false support to an external audit firm" can "constitute[] a deceptive act" sufficient to incur scheme liability under Lorenzo).

Although these two sets of allegations plausibly subject Carchedi and Cullem to scheme liability, the SEC's corresponding allegations about Foegh are relatively threadbare. Foegh is not alleged to have been present at the Board meeting in which Carchedi characterized the FDA's feedback as "positive." Dkt. 1 ¶ 43. The SEC alleges that Foegh, along with Carchedi and Cullem, was a "regular presenter[] at Board meetings thereafter," id. ¶ 44, but nowhere describes the subject matter of Foegh's presentations or explains why her not discussing the FDA's feedback at those Board meetings was fraudulent. Similarly, Foegh is not alleged to have participated in the redaction of the FDA meeting minutes; rather, the SEC merely alleges that Foegh was copied on Cullem's email transmitting the redacted minutes to Company A. While a "failure to correct [another]'s misstatements c[an] trigger [scheme] liability" in some circumstances, Malouf, 933 F.3d at 1260; see Rio Tinto, 41 F.4th at 54 (leaving open the question of whether "conceal[ing] information" can give rise to scheme liability), the SEC identifies no precedent for the notion that being copied on a single email, and failing to inform the recipient about misleading information contained in an attachment to that email, can (in conjunction with only the preparation of other misstatements)

20

support scheme liability. The Court instead concludes that this allegation is too "tangential[]" to give rise to such liability. Lorenzo, 587 U.S. at 79.[8]

Accordingly, the SEC has plausibly alleged that Carchedi and Cullem are subject to scheme liability under Rule 10b-5(a) and (c) and § 17(a)(1) and (3), but the complaint falls short with respect to Foegh. The Court rejects Cullem's argument that the SEC did not adequately plead that he acted with scienter. Like Carchedi, Cullem allegedly knew of the FDA's negative feedback but took steps to conceal it, including by redacting the FDA meeting minutes and sending them to Company A. And, also like Carchedi, Cullem's actions allegedly played in a role in his receiving a bonus and Allarity's avoiding bankruptcy. The SEC thus has alleged, with particularity, facts plausibly demonstrating scienter (and negligence). See supra Section I.

## ORDER

For the foregoing reasons, Carchedi's motion to dismiss (Dkt. 52) is **DENIED**, Cullem's motion to dismiss (Dkt. 47) is **DENIED**, and

---

[8] Foegh's alleged failure to correct the misleading nature of the email is a far cry from the conduct at issue in Malouf. There, the Tenth Circuit held that the defendant could incur scheme liability for his failure to correct a company's misstatements about the defendant's own conflict of interest. 933 F.3d at 1259-60. The company's misstatements were directly caused by the defendant's failure to disclose his conflict of interest to the company, and the defendant had "participat[ed] in deciding what [the company] would disclose." Id. at 1254.

Foegh's motion to dismiss (Dkt. 49) is **ALLOWED** without prejudice to the SEC moving to amend its complaint within sixty days of the date of this order.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge